The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and the Honorable Court. All right. Thank you very much. And we're pleased to have both the advocates here today. And we'll begin our argument in Pierce v. North Carolina Board of Elections. And Ms. Theodore, whenever you're ready, we'd be pleased to hear from you. Thank you, Your Honor. Elizabeth Theodore on behalf of the appellants. This appeal turns on whether there is legally significant racially polarized voting in the black belt counties in Northeastern North Carolina. Meaning white black voting at such a high level that it usually results in the defeat of black preferred candidates. Plaintiffs carried their burden to establish that via four independent pieces of evidence, which together provide overwhelming evidence of legally significant racially polarized voting. And the district court reached a contrary conclusion only by adding requirements that do not exist under settled law and that the legislative defendants don't even attempt to defend. And there is zero evidence on the other side, suggesting that black preferred candidates could win in these 30% districts. So let me start with those four pieces of evidence. First, the extreme levels of racially polarized voting here, combined with the district's characteristics, establish legally significant racially polarized voting. Dr. Breda's Appendix A. Why does, let me ask you that. You say it establishes racially polarized voting. Is that necessarily true? It could establish simply partisan lines of voting. Some people vote Republican, others vote Democratic, others are independent. In other words, partisanship could explain those kinds of statistics as well as race, and it would be up to the district court to decide which is which, would it not? It is not, Your Honor. So this court held in Charleston County, as Your Honor knows, because you wrote the opinion, that the reason for racially polarized voting is not relevant at the Jingles III phase. And I'll get to the totality of the circumstances in a little bit, but the numbers here show that there is white block voting at levels of 85% or higher, 88% in the state Senate elections in this region, in the relevant region. And you'll find this in the Northeast I column in Dr. Breda's report, starting at JA 285. And black voters vote for the same candidates at levels of 99% or higher. There is no evidence in the record that this racially polarized voting is caused by some preference on the basis of politics. And I'll return to that at the totality of the circumstances phase, unless the court would like me to address it right now. But I will say that what this court held in Charleston County is that if there is proof of racially polarized voting, that black and white voters vote for different candidates, if there is no evidence on the other side that attempts to disentangle partisanship and race, then plaintiffs have established what they need to establish for VRA Section 2. That's Charleston County. But that's your burden, is it not? It's not your burden to prove it, it's your burden to prove it. We have proven racially polarized voting. What the court said in Charleston County- Where is the district court's finding to that effect? The district court didn't find that because the district court inserted an additional requirement that is legally erroneous of a district effectiveness analysis, which the legislative deficits do not defend on appeal. And because the district court inserted that requirement, it did not look at the evidence that we presented, which, by the way, is the same evidence that Allen v. Milligan just said establishes legally significant racially polarized voting. Theodore, can I ask about your expert? Because Dr. Barreto was your one expert about racially polarized voting for Jingle 3, right?  And the district court seemed very troubled by Dr. Barreto's methodology that counsel suggested it was a typo. And then the expert seemed to kind of backtrack and say, well, that's a flaw in my methodology, but if I changed it, I could reach different outcomes. And the court said, that gives me great pause. Because of that, plaintiffs haven't proven their case at this point, even though further factual development could perhaps rehabilitate that or change it. I mean, we defer to the district court's assessment of the expert, don't we? So, Your Honor, let me say a couple things about that. First of all, the evidence that the district court did not describe from Dr. Barreto, which is all of his Appendix A and his actual racially polarized voting analysis. That's the evidence that I was just talking about. That alone is enough to establish legally significant racially polarized voting here under Allen against Milligan. The district court cited and relied on that Appendix A. Dr. Alford, who's the other side's expert, did so as well. So, that alone is sufficient. And the only reason the district court held it wasn't was because of this district effectiveness analysis. And I'm not sure that's right. And the district court looked at the evidence that you presented and made a finding that the racially polarized voting wasn't at the level you hadn't proven yet that it was at the level required. The court also mentioned that a district effectiveness analysis would be required to prove that majority-minority district necessary, right? That the states, you know, usually these roles are reversed on who's saying, at least in the past few cases, they have been in North Carolina. But that seemed to me to be an additional reason for the district court's trouble. Your Honor, I don't think that's right, because the district court's statement that it wasn't considering Dr. Beretta's analysis was only directed at his performance analysis, not his racially polarized voting analysis. All of the relevant facts here are undisputed that the 88%, 85%- The voting is politically and not racially polarized, and the party affiliation of the candidates is sufficient to fully explain the divergent voting preferences. And so, at the end of the day, don't we have a battle of the experts here? Both sides put on their experts and onto credibility findings of the district court with regard to expert testimony, due a substantial amount of deference? The Dr. Alford, their expert, he did not say that black-preferred candidates could win in these districts, which is the jingles three question. Nobody in this case has ever said that. All Dr. Alford did was say that the finding of white-block voting was equally consistent with the notion that white voters were voting for candidates based on the race of the candidates. That's the wrong question under this court's decision in Charleston and under this court's decision in Lewis v. Alamance, where the court specifically said that if you're trying to disentangle race and partisanship, it's the race of the voters that matter, not the race of the candidates, because the black-preferred candidate doesn't have to be black. And so, all of Dr. Alford's analysis is just legally irrelevant. And let me get to the second point of evidence, and this is evidence that the district court just completely ignored, which is legal error. It is legal error to ignore relevant evidence and not talk about it. And that's that the one endogenous election within these counties, which is the 2022 state senate election, shows that the black-preferred candidate loses by five points, even in a district with a 42% defect. And that itself proves that the extreme racially polarized voting in what is now a 30% defect district is usually going to result in the defeat of black-preferred candidates. And it's really emblematic of how egregious this VRA violation is and how clearly it flouts what the Supreme Court just held in Allen v. Mulligan. They took a 42% defect district and they cracked it even further so that the black-preferred candidate would lose by 15 points. And that brings me to point three, because this is what the legislative defendant's own website shows. So, their website has a stat pack that has a bunch of tables that shows that black-preferred candidates are usually defeated by overwhelming margins. Is this evidence before the district court? Can we be considering this right now? Yeah, for two reasons. First of all, it's exactly the same evidence that Dr. Barreto offered. And second of all, this court can take judicial notice of it under the decision in Hall v. Virginia. And so, this court can consider it regardless of whether it was for the district court. So, you're saying we could find the district court reached a clearly erroneous factual finding based on facts it never saw? Well, the district court did see these facts, but yes, that's what this court did in the United States v. Gregory case that we cited. It found clear error based on judicially noticeable census data. But again, this stat pack reflects that it was clear error for the district court to simply discount Dr. Barreto's performance analysis showing that white-block voting results in the defeat of black-preferred candidates in these districts in all 27 statewide elections in 2020 and 2022. I mean, that's naturally not a disputed point in this case. The legislative defendant's own website says it. And that's the relevant question for Jingles 3. I'm afraid you're picking at this expert testimony and that, but I wonder if you're considering the whole picture, which is that the Supreme Court has stressed in these vote dilution cases, that district courts are composed of, quote, local judges who are well acquainted with the political realities of the states. And the district court here went through the Jingles factors, made findings with respect to each of them, found that the most problematic from your point of view was precondition 3. And there was a battle of the experts here. And then the district court, after finding that the plaintiff's expert testimony had some deficiencies, went and said, I don't need to go into the totality of the circumstances, but he did. And he went through the totality of the circumstances, and it must be 10 or 12 of them. And he mentioned certain things that he says, and this is an overall picture. Plaintiffs have failed to show that few Black candidates won office in North Carolina. And they pointed to the fact that the lieutenant governor was a Black Republican, and there were minority leaders of the House and the Senate were Black. Black candidates have consistently won election to statewide appellate judgeships. And all of this is very good news. It's the kind of progress of which the South can be proud and North Carolina can be proud. And what I'm wondering is these kinds of change conditions where we have substantial Black representation in the leadership and state legislatures of the states. I wonder why in the 2013 or 14 case of Shelby County, Chief Justice Roberts, although he was dealing with Section 4 of the Voting Rights Act, he nonetheless pointed to change conditions as being a testament to the success of this wonderful landmark piece of legislation that is the Voting Rights Act. And I wonder why Judge Dever couldn't, in his totality analysis, take into account those same conditions and say, look, things are thankfully much better in North Carolina than they were in the past. You don't need to be impatient with me because I'm going to give you some extra time, okay? Because I've taken up some of yours and I don't want to do that. But tell me why in light of Shelby County and the role that change conditions played with respect to Section 4, why those same conditions wouldn't allow state legislatures a greater presumption of regularity and non-racial voting than in times past? Tell me why. Well, Your Honor, as you know, Justice Roberts just held in Allen v. Milligan that the same jingle factors that have applied since the 1980s are what's relevant for Section 2. And they do get a presumption here, which is why we have to establish the jingle factors. And I will say that North Carolina cannot be proud of these two districts. They literally take the black belt and they slice it down the middle. I mean, it's really reprehensible. And I will say this, the district court analysis, the fact that Senator Blue in a completely different part of North Carolina could win election is legally irrelevant because the question is, jingles requires a local appraisal. And we know that what happens in these districts, which is what's relevant for jingles, is that the black preferred candidate is going to lose because that's what happened in 2022. And then the legislative defendants split this district even further. Okay. Your response to me indicated that, well, what happened in a different district is not relevant here. But the point is, it's the state legislature as a whole that is doing the redistricting. And it's state law that binds localities and the rest. But I don't understand why the statewide picture wouldn't have some relevance, given the fact that it's not just these two representatives from Northeast and North Carolina that are voting on this. It's the state as a whole. And the state as a whole has a lot of things it can point to to be proud of. Your Honor, this is not, it's not Durham, it's not Charlotte, it's the black belt. And I will tell you, Your Honor, the lesson of Cooper and of many of the Supreme Court's cases is that you need to look at the actual districts at issue. You can't trade off the rights of black voters in these districts because of the possibility that a black voter somewhere else in the state may have an opportunity to elect a candidate of choice. This is an area where if you didn't crack the black belt, black voters would naturally have an opportunity to elect a candidate of choice. And, again, I just want to emphasize the undisputed facts here, which are not in dispute, which is that if you look at the Northeast one column of Dr. Beretta's report, which the district court credited and which Dr. Alford, their expert, relied upon. So there's no dispute in this case that those facts are established. It shows that 99% of black voters vote for the same candidate. It shows that like 85 or 88%, depending on the election, of white voters vote against the black preferred candidate. And it is undisputed because the legislature's website shows it, and our expert showed it too, that in every single election in 2020 and 2022, the black preferred candidate would lose in these districts. And I don't think it is possible. You're making statements and you're making conclusions. But the difficulty I have is that I don't see the findings that back up those statements. And I think we're talking about an abuse of discretion standard. We're talking about clearly erroneous findings of fact. And what troubles me is you're asking us to overturn the work of the state legislature, to overturn the findings of a district judge, and to have the electoral system of North Carolina in a complete state of limbo for an indefinite period. But you're asking us to overlook a standard of review. And you're asking us to overlook the presumptive authority of state legislatures. And we're going to be creating what worries me, counsel, is that this case has been up and down in the state court system. It's been up and down there, as we know, in the federal system. And at some point, doesn't North Carolina deserve a certain amount of stability in its electoral system so that candidates will know what district they can run in and voters will know who they are voting for? In other words, stability increases the bond between the representative and those represented. And I realize that there are malapportionments that need to be corrected from the standpoint of one person, one vote. But at a certain point in time, I'm concerned about keeping the electoral system of North Carolina in a continual state of flux. And I'm not sure that's the way representative democracy is ideally supposed to work. And I know you say, well, this is not, it's not stable if it's racially loaded. And I agree with that. And I agree with that. But isn't stability, doesn't that have a virtue of its own, not continually litigating this and keeping it in a turned up state all the time? Tell me what your reaction to that is. Your Honor, the General Assembly is the one that chose to change the districts in 2023 to take the prior districts that had a 42 percent BVAP and slash the BVAP even further to 30 percent. I mean, that was their choice. No one made them do it. And look, Your Honor, this is a clear VRA violation. I appreciate I appreciate your concern about stability, but the Supreme Court just held in Allen against Milligan that VRA Section 2 is still a really central and important part of federal law ensuring black opportunity. And I think this court's precedents make crystal clear that violations of the VRA need to be remedied. Before your time is up, do you want to address Purcell and the problem that absentee voting has already been happening for a number of weeks, in person voting starting today? You know, we have pretty clear direction from the Supreme Court and from our own precedent about not interfering at that point. There are no elections in these 2 districts. We are asking for an injunction against 2 districts. That's not necessarily the case once the districts change, right? You're asking the state legislature to redo the districts. Yes, it is. It is possible that there will be primaries in May. The State Board of Elections has said that it is administratively feasible to do that. I'm not aware of a single case where the Supreme Court has rejected a change in voting laws on Purcell grounds where the State Board of Elections has said that it is administratively feasible. Well, there's a difference isn't there between feasible and causing confusion and voter disarray. That's the concern of Purcell. If it was infeasible, you wouldn't need Purcell. In what was the Alabama case, Merrill Milligan, there the court didn't step in. The court stayed federal court intervention when it was 9 weeks before the primaries, absentee voting in a primary started. So, a couple things about that. So, first of all, there have never been any elections in these districts. There will be no voter confusion. There is no primary going on in these districts. In Merrill, again, you're asking them to redraw the district. So new candidates will have to declare again. There will be different districts. Candidates would have to declare. There might be primaries at that point. There may not. People who live, you know, the military, absentee voters will then, you know, the state board will have to make the ballot, etc. The question for Purcell is, has the process started? Not, can you think of a way to squeeze it in in time? But the process hasn't started in these districts. No ballots have gone out to a single person in these districts, including military voters. And so, if there were to be a primary in May, that would be the first time that anybody in these districts would be receiving a ballot for these districts. And in Merrill versus Milligan, there are several differences. First, in that case, the Board of Elections told the Supreme Court that what the plaintiffs were asking for was impossible. We have the opposite result here. And again, I don't think there's a single case, legislative defendants certainly haven't cited one, where the Supreme Court invoked Purcell in these circumstances. Second, we're asking only for a change to two districts. That was not the case in Merrill. Well, the point that I thought Judge Rushing made a good point, and to say you're talking about the existing districts, but whether there would be primaries or what they would be in the redrawn districts is not something that we can foresee. And I'm not sure what the remedial phase of this case would look like. You say, oh, it could be contained because it would only involve redrawing these two districts. But my experience following redistricting is that districts are often like dominoes, like falling dominoes, and you try to correct in one situation, and that throws things off in the contiguous districts. And it's never as simple. Redistricting is never as simple as it seems. And what is the remedial phase? Are we going to send this back to the state legislature, and then they're going to redraw the districts and might not like what they've redrawn? And then we're going to have another challenge and another suit? And so looking at the remedial phase of this case, where would it ever end? Your Honor, I think that this court could give sort of pretty clear direction in the remedial phase that would avoid the need for any further litigation. And I think what this court would simply say is that the legislature needs to, and this is what the court said on remand in the Allen v. Milligan Alabama case, that the legislature needs to draw a district that's either majority minority or something quite close to it. That's what happened in Allen v. Milligan, and the Supreme Court declined to stay that remedial order. Counselor, in part of your response to Judge Wilkinson about the scenarios he talked about in terms of the domino effect, in this case, looking at the facts of this case, that's not the case, because as you started with, this is such a clear situation of going right through the heart of the black belt, which has existed for centuries, a couple of centuries in North Carolina, and go right through and split it. So the remedy here with those two is clear. To look at that map that goes from the southern border of the great commonwealth of Virginia all the way to the sea is incredible in terms of the way it looks. It just snakes all the way down through there, and that's what we're talking about here. This is a different type case than you're talking about all around, but of course, if North Carolina chooses, I guess, in a remedy to do something that recalls a domino, then that would be their own choosing. But here, it clearly does not require it at all. That's right, Your Honor, and I'll note that the district court acknowledged that the legislative defendants could select a remedy here that would not require altering anything other than the boundaries between Districts 1 and Districts 2. That's our demonstration District B1, that's J961. The district court said that, that that was an available remedy in this case, and it wouldn't alter any other district. And so the injunction we're asking for is just an injunction against current Senate Districts 1 and 2, which the legislature can remedy via our demonstration District B1. B1 is a crossover district. Wouldn't that be an unconstitutional racial gerrymander? No, Your Honor. First of all, I mean, let's put aside whether B1 is a crossover district, which we disagree with, but let me assume that it is. I mean, the holding of Cooper against Harris, I don't think it could be any more clear that a crossover district is a valid remedy for a VRA violation and is compliant with the VRA. And again, I agree with you that Cooper couldn't be more clear. It says a crossover district doesn't, it's not a, it's not a constitutional violation. You can satisfy the VRA with a crossover district. But it also says a state can't racial gerrymander to create a crossover district, because that would be, quote, a pure error of law, Cooper said. A state can't use race to draw a crossover district. Respectfully, Your Honor, that is not what Cooper said. I urge you to go check for the part of Cooper that says a pure error of law. We can move on. But I think the court was pretty clear that states can't take race into account and draw borders totally on the basis of race to create a crossover district. What Cooper said is that if it is not possible to draw a minority, a majority minority district in the relevant region, then the Jingles factors aren't satisfied because Jingles 1 isn't satisfied. But what Cooper said. Isn't that part of the problem here is that the solution you are asking for under a heightened standard, that the status quo is the current map. So there have to be extraordinary circumstances in addition to the preliminary injunction factors to order a court to order the state to consider race, order the state to create this. And it's on a P. I. Right. So if we're wrong, if there's it turns out they're not you're not going to succeed, then the state, the federal government has ordered the state to violate the Constitution. If it turns out that you were not going to proceed on the merits. I mean, yes, but I think, I mean, well, I, we have shown that we are going to succeed on the merits in our view, of course, and your honor again, I just so what happened in the remand of Allen against Milligan establishes that what we are asking here for here is. Compliant with the in Allen in Allen against Milligan, the district court imposed as a remedial district, a 48.7% feedback district and the Supreme Court declined to stay. So, I don't think there's any reasonable dispute that a. That a crossover district is a compliant district as a remedy. And again, the district court said, so that's what the district court said at 961 that the legislature could choose to adopt demonstration district. The 1 is a remedy here. I realize I've taken up. Your time and that with with questions and everything, and I owe you an apology for that, but I wondered if I want to make sure you have a fair chance to present your full argument. Is there anything further you wish to say to us? I would just, I would just make sort of a closing point, which is that. This court and the Supreme Court have made clear that although there's a clear error standard, that doesn't mean that the court doesn't engage in search and review like, and easily versus and like, and other cases. And here, the district courts findings were both legally erroneous and clearly erroneous and they, including because the district court ignored key pieces of evidence that we had presented, including in particular their performance. Of these districts in 2022, just ignored it and that's a legal error. And I would say, in closing that I think the idea that black preferred candidates can win here is totally unrealistic. This court, this court's analysis of the evidence and of whether the district court clearly aired is supposed to look at the whole. All of the evidence, and I think if you look at all of the evidence, it is clear that we've shown that we've been. That jingle 3 is satisfied and with that, I will. Thank you. Let me ask my co panelists. If they have more questions of you, judge Gregory, would you do you have some further questions of this? No, just the 1 question I asked. All right, do you have further questions of this? I do now. Thank you. Thank you so much. And you also have some rebuttal time that you've reserved. Thank you very much. I appreciate that. All right, let's hear from you, sir. Thank you judge. Good morning and may it please the plan is here challenge factual findings by the district court that are subject to clear air review. Under this standard, the district court's decision must be upheld. This includes factual findings about the jingles 3 analysis. The district court found counsel does clear air include ignoring clear facts. In the record, is that clear? When you ignore facts record. I'm not saying you have to concede that that was done. I'm just asking you, because you started out with clear areas. Is it clear where you. Ignore. Clear facts in the record. Clear undisputed facts. I hate to sound like a lawyer, but it depends. The district judge gets to decide. Which fast he or she finds to be credible or supportable. And what is clear to 1 person might not be clear to the other. And 1 judge might think that a particular fact in the record was undisputed. Another judge might say, no, I think it was. So, here, though, we don't think the district judge ignored any facts, much less any that were undisputed. Instead, he just found that the facts that the plaintiff presented, particularly on jingles 3, just came up woefully. Short, and that was in part because of their own doing. They submitted an expert report. Where the expert to begin with only opined about statistically significant, racially polarized voting, not legally significant. And then in 1 of his table, his table show that the black for candidate would indeed win in Senate district to this very district. It's being challenged. And then when the judge pointed that out at the hearing, it was 1st represented. Well, maybe that's a typo. And then the expert came back with a completely different analysis analysis. It's never been tested or subject to cross examination. And so that is the classic stuff in my view of clear error. Review the district court was well. The expert was explaining how that 54% margin in terms of winning occurred in terms of trying to extrapolate in the district that had never had. And I've been elections and to go in new, right? Wanted to write. So, you had to look at what had happened in the district. Right? And he was explaining that in the sense that normally under that, you don't look at uncontested races because excuse the results. That's all he was explaining that he never changed it. If there was any kind of smoking gun, why would he put 54 in there? He never hit that. It never backed away from it. And to suggest that that's a basis to wholesale take away credibility. When your expert didn't really. If you anything, in fact, it almost matched up quite well with what exactly he said. So, how do you even if you said that you didn't credit believe in doctor anymore, you still had Dr. Alfred, which basically did not refute his statistics. So, it's almost like you're trying to find that where an expert is being put on experts supposed to do that. As I explained, because you asked the question, I gave the number and then you say, oh, my goodness, I can't believe anything you said. But can you believe Dr. Alfred who agree with most of them? Can you explain that? Why is that not error? Because what Dr. Barreto did is he walked back his own analysis. That's a big red flag. He did not walk back. He explained how that number occurred. Walk back would be he didn't say, oh, that would be so. I didn't. He didn't say, oh, that is a typo. Let me know what it would have been. No, it is what it is. But I'm going to explain to you how that occurs and how if you did what you normally don't do is include, take out that aspect of the uncontested races, they would lose. That's just the science and statistics. That's not somebody being fast and loose with the fact and back and back. That's a skewed and unnecessary and appropriate conclusion to make from that in terms of the facts of this record. Your honor, I respectfully disagree. The district judge would respectfully disagree. I'm sure, you know, I say tomato. You say tomato. Why didn't the district court acknowledge that almost everything Dr. Barreto said in terms of those statistics, in terms of the jingles three, he agreed with in terms of the facts. I don't believe I don't. I think he could replicate his math, but replicating math is not the same thing as agreeing with conclusions. And Dr. Dr. Alfred concluded that you didn't need 50 percent plus one to win in those districts. And so and he concluded that overall political decisions, political polarization better explained what was going on in Dr. Barreto's number. So, no, he didn't agree with Dr. Barreto's conclusions. Dr. Barreto undermined himself in this case by submitting an analysis that he then, in my opinion, walked back after the hearing and the district judge was well within his rights to say, that's a red flag. I'm not going to assess any credibility to that. And and then I'm going to, it's their burden, it's the plaintiff's burden to prove this. And on the jingles three analysis, you know, to the extent that Dr. Barreto was saying he was concluding that there's legally significant racial polarized voting, which is what he was not looking at. But even if you assume that. He didn't do the district effectiveness analysis that Covington requires. And the reason you do a district effectiveness analysis, because under Bartlett and under Covington, there's there's no jingles three showing if you can't show that the district that you want the black voters need 50 percent plus one to win. That's very clear. Mr. Strauch, let me, I asked opposing counsel about what the remedial phase of this suit would be. I was concerned about an extended period of uncertainty for the North Carolina elections and the electorate. And destabilizing the system and missed it or replied to me. No, this can be easily contained and you can have a remedy. Just focus on these two Senate districts in Northeast and North Carolina. Is that true? Is it something that can be meaningfully contained or what? What is what? I don't know what the future of any kind of reversal would be like and what the remedial phase of this case would entail. What what is your response to miss theodore's answer to my question? Thank you, judge. The legislature, if they were ordered to redraw this, the districts really no telling what they could do. It's an entire legislature. We do not think he could be wholly contained to the two districts that the plaintiffs have identified because they would have to draw a crossover district. And to do that, they would have to violate the state constitution to draw that crossover district and use race to do it. And under under Bartlett, that would that would violate the US Constitution. It's not required. So, if they were going to try to draw another district, the plaintiffs have, for instance, brought up this demonstration district a. Which is outside of the groupings that are at issue here. If they had to do something like that to draw a true 50% plus 1 district, well, then that would implicate the entire Senate map and the entire map would have to be. Regroup and redraw and that would impact the entire state. And that would require new elections in the entire state. Judge rushing is correct. Early voting started today. Absentee votes have been going out. If all of that got disrupted because of the of an order to draw a 50% district say, then the entire state would be impacted and. What's important to realize 1 question I have is our federal. No, we don't want to overstep our remedial authority. Are we on thinner ice when we try to I mean, a lot of these redistricting plans, the remedial phase is redraw the whole thing. Are we on thinner ice when we craft a remedial instruction to a state legislature and say. Just do these 2 districts because redistricting is something that because everybody's affected it. You have to look at it holistically and I'm wondering about whether. Whether we have. And in some sense, overstepped our bounds when we say. Do this in this partial in this partial fashion? What do you think about that? I agree with that your honor the court doesn't have the authority in our view. To micro manage how the legislature complies with a remedial order. The legislature has the responsibility of districting in the 1st place. They're the state sovereign body responsible for that. So, I don't think courts are allowed to come in and dictate, micromanage and say, this line has to go here. This is dealing with the 2 districts alone. Is an instance of micro managing. The redistricting process, which would undercut the state authority, the authority given to state legislatures and state and federal constitutions. Yes, your honor. That's correct. If we came in, if the court said, you have to limit your remedy to these, this, this particular, these 2 places. When the legislature could, in theory, come up with a broader, a different remedy that would still satisfy the court, then that would be the court micromanaging the legislature. Is it micromanaging the legislature in terms of finding that you violated? Section 2 of the board rights act and say that must be a remedy. Appropriately address that. That's not micro micro. And that's what changed. I thought in 1965, a dismal and horrible trajectory of this country historically. It's considered to be 1 of the most important piece of legislation. Ever passed in this country in terms of democracy and justice. No, no quarters ever found was micromanaged. What's your response to that? The 3 panel court talked about it was less than a 50% feedback in terms of the remedy screen. Court didn't say that was wrong at all. Matter of fact, but that didn't play kept that in play. So what are you talking about in terms of micromanaging in this time? For example, you say for sale, for example, because now everything is on how long it's going to take is a problem. Is it in this case? Was it too late? Let's put it this way. If they had filed this action 2 days after October 25th. Would it have been too late then? It would have been, but I'm not sure, but it would have, it would have, the percent argument would have been a tougher hill to climb if they had filed this lawsuit from. So 26 days would have made a difference in terms of time here. Sure, 26 days, your honor, and redistricting is a lifetime. In these cases, 26 days, I've had cases go from start to finish in 26 days. You said it because if we create a remedy here, you can do so before May 14th in terms of the primaries, if it is necessary. We would certainly be right if it's well spirited and trying to comply with the law. 26 days can mean a lot, but didn't the general assembly here sit on this for 6 months? No, actually, sorry, your honor, no, not at all. The opinion in Harper 3 came out, I think sometime in April, but the court was not actually docketed. It was finally docketed with the Wake County Superior Court after the time period to file a cert petition with the U.S. Supreme Court had run. So there really wasn't anything to do until at best around August or so. Until August? Until August, at which time the legislature was very busy with the budget, expanding Medicaid, building new hospitals, and doing a lot of important work. And as soon as they completed that work, they turned right to redistricting and got it done pretty promptly. You came up with the same map you had in 2001. Right? You did the same thing. Isn't it the same thing, the way you split the bank bill? Isn't that almost the same? No, your honor, so it's the same district. That's what I'm talking about in terms of this work you had to do. Let's assume that August was the time frame and not April, which is questionable. But if it was, then you just walk over there and you use the same map and then it would be in August. My question, though, is this. If time, if temporal restrictions are solely the answer, then you could get around any potential Section 2 violation by just waiting until it's too late. Like you did in October 25th, right? And then you started the process for candidates registering, which was December the 4th. You made those timelines, those types. And then you come here and say, oh, we can't do this. This would be the death of Section 2, to draw lines so clearly, splitting up black votes in the black belt of North Carolina. And then to say, oh, we did it in October 25th, so that's too late now for you to stop the process for the 2024 elections. Very important elections are in 2024 coming up, and everybody wants to get it right and according to the law. Wouldn't this be the end of Section 2? Not at all, Your Honor. How would it be? All redistricting cases are unique in the timelines that each are unique in what courts can and can't do. Remember, Purcell is not just about time. Purcell is about voters. It's about disruption, confusion. And so it's a very complex analysis that doesn't just look at a calendar. No, it wouldn't be the death of Section 2. And even if a preliminary injunction is denied, that doesn't mean the case goes away. The case goes on and there's a full trial on the merits. Everybody's entitled to a full trial on the merits. And if they're finding after that, the courts can work it out and make sure that the districts are changed before another election goes by. This is all about a preliminary injunction. Oh, another election. Correct. You mean, right, so another year. Correct, correct. And you think that that's justice? That's called litigation. That's called litigation. That's called if you can delay until the clock almost runs out and come to federal court and say, oh, you can't do anything because it's October 25th and 28 days later they file it. It'd be pretty easy to do. And this would be a case on steroids. One, because the matter is so clearly what it does in terms of how it tracks the black belt. That's one. And the other one, the fact that you use the same plan that you had in 2001. I can't imagine if this goes through, what scenario wouldn't be successful to stymie and if not kill Section 2 of the Voting Rights Act, which is the only thing left of it. The rest is gone. We don't have preclearance in terms of Section 5. So wouldn't that be the end? Because that's what you're telling us. We can't do anything now. It's wait another year. Justice delayed is justice denied. I disagree. I know you disagree. I'm talking about the law in terms of what we have to do as a federal court is protect statutes that are meant to help protect the rights many times of the dispossessed and those who are least able to protect themselves. And the court also has the obligation to protect voters from disruption and confusion. Are they not voters? The category I talk about, are they not voters? They're all voters. And they're all being potentially subject to confusion and chaos based on what the plans are asking this court to do. And that's something that the court is also obligated to take into account. And, Your Honor, this is not a clear violation of the VRA. That configuration was drawn in part by the state constitution. There were two groupings that could be chosen. That was one of them, one of the two legal groupings. And to not follow that state law, there would have to be a showing of all three jingles factors. And we've vigorously contested jingles one, jingles three. So, no, this isn't a clear cut violation. This is a state following state law. So state law requires you to reduce the 42% black vote population down to 30%? That was one of the two legal options available to the state under the state constitution. That's not the map drawer doing that. That's the state constitution and the grouping requirements saying here are your two choices. The state constitution doesn't trump federal law. Of course not. It's voting rights. If there's a finding of the three jingles factors in the totality of circumstances, which isn't the case here. So in that case, state law does, in fact, win out, as we know, from Pender County versus Bartlett. And as a result, the district court's decision should be affirmed. Unless the court has any other questions, Judge Wilkinson? I hold on because I want to make sure that everybody has a chance to ask the questions if they want. Judge Gregory, do you have any further questions of Mr. Strach? No, I don't think so. Judge Rushing? Thank you, Judge Wilkinson. Thank you very much, Mr. Strach. Thank you, Your Honor. Ms. Theodore, you have some rebuttal time, so we'd like to hear from you again.  I want to start with a remedy. Mr. Strach said it would be messy and it could entail a statewide redraw. The district court found at JA 961 that this could be remedied with a redraw that only affects districts 1 and 2. That's what the district court found. And so the entire Senate map does not need to be changed. And I'd like to respond to your question, Judge Wilkinson, where you asked about whether an order sort of limited to the districts at issue would be micromanaging the redistricting process. It wouldn't be. It would be confining the remedial order to the violation, which is exactly what the Supreme Court has repeatedly said federal courts are supposed to do. So I don't even see how this court could issue an injunction linked to the entire state. The injunction has to be confined to the violation. All right. Well, that's the question that I have, is whether it's really possible to issue that confined situation, because I just think one district affects another. And theoretically, it seems possible. But when you get into the practicalities of redistricting, the whole legislature has to weigh in. One of the questions that I had, and it bears on the remedial order, but doesn't Purcell stand for two propositions. Number one, it guards, it cautions us against last minute interventions into the state elections process. But I think Purcell speaks to a wider concern, and that is that at some point the state needs stability. So there's the particular focus of Purcell in terms of electoral disruption of the particular election. But there's the larger concern of Purcell that at some point a sense of, I won't say finality, because this is a preliminary injunction, but a sense of repose that gives candidates and constituents some idea of what the map is going to be. That's my concern, is just how long does this go on? And what are the consequences for the state's electoral process? And, Your Honor, it is not too late. The State Board of Elections here says it is not too late. You did not hear Mr. Strack dispute that there has been no Supreme Court case that has issued a Purcell stay in this context where the State Board says it is not too late. And, you know, think about it this way. If these districts remain in place in 2024, the black preferred candidate is going to lose. If they remain in place in 2026, 2028, 2030, the black preferred candidate is going to lose in violation of the VRA. And the VRA trumps Purcell in a situation where the State Board of Elections has said it is permissible and possible. And I agree with that. But one of the things my colleague, Judge Rushing, alluded to is there's a very difficult tension that's going on here with which, frankly, I'm struggling. And that is that the Constitution seems to mandate a race-neutral approach to this question. And then you've got the VRA, which appears to mandate a race-conscious approach. Now, I think the courts have tried to harmonize that as best we can. But the district court did, as it should have, take a racially sensitive approach and went through the jingles factors and everything. But if we reverse and say, here, this has got to be more and more and more race-conscious, I wonder, are we aggravating the tension between the race neutrality of the Constitution and the race consciousness of the VRA? And so how do you harmonize what seems to me to be some tension? Because on the one hand, you have the 14th Amendment. And on the other hand, as Judge Gregory points out, we have a magnificent and landmark piece of legislation which has contributed enormously to the fairness of elections. And so how do we harmonize those two? Because I frankly find there's a tension for me. I think, Your Honor, look, remedying the clear VRA violation does not violate the Constitution. The Supreme Court recently harmonized the constitutional issues and the VRA issues in the Allen v. Milligan case, where Justice Roberts wrote an opinion that really resoundingly reaffirms the jingles framework. And the similarity between the facts here and the facts in Merrill v. Milligan are remarkable. So, you know, Mr. Strack said there were factual issues, but here are some undisputed actual facts. I appreciate that the district court's treatment of how those facts affect the VRA analysis are disputed. But here are the facts. 98 to 99 percent of black voters in this particular region, which is the Northeast One region, in Dr. Barreto's report, vote for the black preferred candidate. 85 or 80 to 88 percent of white voters vote against the black preferred candidate. Those are the same numbers at issue in Merrill v. Milligan, the same numbers. And the Supreme Court said they established stimulus three. And then the other undisputed fact is that according to their own stat pack on their own website, the white block voting defeats black preferred candidates in these two districts under every single statewide election in 2020 and 2022. You did not hear Mr. Strack say in rebuttal that I got that wrong. You did not hear him dispute that that is what their website does. If you just look at their website, you could find those facts. And that's what we're missing. We're still missing the district court's finding on this issue. Because to the extent that the district court considers just what you were talking about, that is easily attributable and in fact is attributable to partisanship, to the divisions between Democratic voters and Republican voters and independent voters. And the young and the commitments that go with that. I mean, it's it's one thing to cite the statistics, but to say whether the statistics are attributable to race or partisanship, it could be either. But it's true that it's up to the district court to determine which is which. And regrettably, from your perspective, the district court did not find that that was that that was attributable to race. It's a matter of partisanship. What do we do with that? Your Honor, I think that the court's decision in Alamance and Charleston County makes very, very clear that such a finding is just categorically irrelevant on Section three on Jingle Factor three. And it makes clear that the type of analysis that Dr. Alford did is also legally irrelevant on the totality of the circumstances, because Dr. Alford's analysis does not focus on the race of the candidates. But instead, I mean, the race of voters and said the race of the candidates and your honor, what you just said could be established in every single Voting Rights Act case. All Dr. Alford did was say that black that white voters vote for white Republicans. That's all he did. He did not attempt to perform any analysis of causation. And again, if you just look at your opinion in Charleston County, literally that is what this court said was insufficient to support a finding by the district court in that case. But there was no VRA violation. Black voters in the black belt have been targeted for 150 years due to the race. And with respect to the sort of interaction between the VRA and the Constitution, one of the benefits of VRA Section two is it doesn't require the court to find racial animus on the part of the legislature. It allows the court to ensure that black voters have equal opportunity, even in a situation like this where the where the legislature literally cracked the black voters down the middle without having to make a finding of racial animus. And that's a good thing from the perspective, I think, of the federal court system. One thing the district court, he looked at the other provisions of North Carolina law and he said. Plaintiffs, one of the findings was plaintiffs failed to cite evidence that North Carolina presently employs voting practices that enhance opportunity for discrimination against black voters. So he's looking at the state's practices as a whole, which apply to these northeastern counties. And he said, I don't I don't find in North Carolina law the kind of practices that would give rise to invidious discrimination. So it's all of these findings that that I think impose the most difficult obstacle for you. It could have been a different set of findings that went your way. But it didn't. And it's got to be germane in some way that the district court said, I've looked at North Carolina law and I don't see. Features of North Carolina law that would enhance the discrimination that all of us would deplore. Your honor, and I would say that on that factor in particular and on multiple other factors, the district court's analysis of the totality of the circumstances contained legal error. And because it contained legal error, that means that this court needs to look at those facts and reweigh and reweigh the totality itself. And I would say that at least factors one, two, three, five, six and nine contained legal error. I mean, some of the legal error is just clearly is just clear in light of Allen versus Milligan. Like, for example, with Senate factor one, the district court said that historical evidence of discrimination doesn't count. Allen versus Milligan said it does. And with respect to the factor that you just talked about, your honor, about practices that enhance the opportunity for discrimination. But the district court said that it has to be current factors. That's contrary to this court's this court's own holdings. This court has said that the question is whether the jurisdiction has adopted such findings. That's what the court said in Charleston County, not what the district court said about it presently employs. Oh, I was pointing out was the Shelby County case. Chief Justice Roberts said changing conditions matter. You know, you're not. And. And thank goodness they do, because I think change by and large has been very beneficial to the kind of opportunity for Americans of all backgrounds, ethnicities and races to participate fully in our democratic process. But the problem I have here is that. Is it the findings at this very preliminary stage? I think I think they're tough to overcome, but but that's. I want to ask my colleagues if they have further questions. I want to thank you for your your argument and tell you how much I appreciate it. Mr. Strachan, I want to thank you for your argument as well. And for the briefing that you all have has benefited this court along the way. And Judge Gregory, do you have any further questions of Ms. Theodore that you'd like to ask? Would you address what you contend is the legal error in terms of the court believing and finding and determining that must be able to have to show that you have to have a majority. On district in order to meet jingles three. That's a finding of that's contrary to law. So, yeah, I think Cooper against Harris holds quite clearly. That if you can draw a majority minority district for purposes of jingles, 1. The remedy can be a crossover district. That's what Cooper says. And these demonstration district be 1 is a crossover district, which we dispute. But assuming that it is, it satisfies the VRA in exactly the way that the crossover district issue in Cooper versus Harris satisfied the VRA with respect to the district courts district effectiveness analysis holding. Yeah, so that I mean, that's a whole the district court said that you to establish legally significant racial polarized voting. You have to do a particular statistical analysis shows the precise level at which a district that is a crossover district. That's not effective becomes effective. No court has ever held this. Not a single court has ever held this that term only appears in 1 other court case ever in the Covington case. And Covington makes clear that it's not it's not holding that that is required and it's notable that the legislative defendants in their brief do not defend this analysis at all. And I think that's a clear reason why the district courts analysis should be should be reversed. And I will just say, in closing, the decision should be reversed. But I think if this court's concern is focused on Purcell, and that it's too late to disrupt things in light of where we stand right now with the elections. The proper course would be to hold to hold it. Our request with respect to the 2024 elections is moot and to vacate the decision below in light of that. And I think what your honor just pointed to about the district court's legal errors with respect to the sort of district effectiveness analysis really highlights why the proper course here. If the court is not going to reverse would be to vacate in light of mootness because requests for an injunction was not tied to election day and your complaints. You request injunctive relief. Preliminary and permanent injunction to prevent enforcement of these districts. Full stop so how on earth is that moot? Well, I think our, I think if this court finds that it is too late to give us relief for the 2024 elections, then this dispute right now about the preliminary injunction, the court could find that it is moot and then vacate the decision below. And that would be the proper course, but that's not what your request for preliminary injunction in your complaint is not tied to just this election. So, if you had phrased it, as we only want, you know, all we care about is an injunction for this election, then perhaps. You know, if, if we thought for sale went that far, then perhaps. It would be moot, but as you requested the relief in your complaints, your case is certainly not moot. Even if for sale would prevent. A P. I. Well, the P. I. is only is only necessary in light of in light of the 2024 election. So, if we can't get a P. I. for the 2024 elections, there would be no. Need for a P. I. because we, well, this happens all the time. Someone asked for preliminary relief and an election case because they want it right now. But even if they can't get it right now, it's still, I would think from your perspective, a problem that needs to be remedied in the future. And so the case is not moot and preliminary release is just about is it so clear that you have proven you're entitled to release today? And even if not, you might be entitled to release down the road, but you just haven't proven it yet. I think the, I think preliminary asking for a preliminary relief entails a finding that. That you need, you need the preliminary relief because you can't get permanent relief in time. And so, again, again, you're right. I think that doesn't make it moot. Right? We don't, we don't vacate district court judgment on P. I. because. Things need to proceed to up to the permanent injunction route. Your honor, the court often vacates P. I. the district court orders on P. I. as as moot. And again, I mean, I think that's that's what would be appropriate here. Given the very clear legal errors, which will be problematic across the state. So, in conclusion, I would just ask the court to reverse the decision below and I appreciate the court's time and giving me so much extra time. Gregory, do you have further questions? I have no. All right, again, thank you so much. Thank you. Mr. Strikes. We appreciate. The hard work that both of you put into this case. I will ask the courtroom deputy. She will please adjourn court. And the 3 judges will then go into conference. This honorable court stands adjourned signing die. God save the United States and dishonorable court.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Allison J. Rushing